UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| FRANK EDWARDS ADAMS,<br><br>Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | 3:22-CV-03015-RAL<br><br><br>OPINION AND ORDER GRANTING<br>GOVERNMENT'S MOTION TO DISMISS |

A jury found Frank Adams guilty of conspiring to distribute methamphetamine. Adams appealed his conviction and sentence, and the United States Court of Appeals for the Eighth Circuit affirmed. United States v. Adams, 18-CR-30147, Docs. 186, 187.[1] Adams now moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. Adams v. United States, 22-CV-3015, Doc. 5.[2] Adams has filed pro se numerous documents related to his several claims, which include ineffective assistance of counsel, prosecutorial misconduct, witness credibility issues, and violations of his Fourth Amendment rights. The Government moves to dismiss Adams's petition for failure to state a claim. CIV Doc. 41. For the reasons explained below, this Court grants the Government's motion and denies Adams's § 2255 motion.

I.     **Factual Background**

---

[1]Citations to Adams's criminal case hereafter will be "CR Doc." followed by the document number from the Case Management/Electronic Case Filing (CM/ECF) system.
[2]Citations to pleadings from this case, 22-CV-3015, in which this Opinion and Order is being entered, will be "CIV Doc." followed by the CM/ECF document number.

At trial, the evidence established that from December 2015 to November 2018, Adams traveled from St. Paul, Minnesota, to central South Dakota with methamphetamine as part of a conspiracy to distribute methamphetamine throughout the Crow Creek and Lower Brule reservations. CR Doc. 150 ¶¶ 6-18. The government called sixteen witnesses, including five individuals who were directly involved with Adams's drug distribution and who testified pursuant to cooperation agreements. CR Doc. 178 at 2, 109, 416. Each co-conspirator testified at length about Adams's methamphetamine distribution activities, and each was cross-examined extensively about the individual cooperation agreements.

A.R.[3] testified she met Adams in 2014 in Bismarck, North Dakota, and began selling methamphetamine for him. CR Doc. 150 ¶ 6. She estimated that she sold more than 300 grams of methamphetamine supplied by Adams in a 15-month period on the Crow Creek Indian Reservation. Id. A.R. eventually had a falling out with Adams, and Leon Whitney then became Adams's primary dealer. Id.

T.J. testified Adams was her main supplier of methamphetamine. CR Doc. 178-1 at 72. T.J. introduced Adams to Leon Whitney around 2015 or 2016 so that Whitney could make money dealing methamphetamine. CR Doc. 150 ¶ 10. T.J. then dealt underneath Whitney and received nearly 500 grams from Whitney to sell and use. Id. T.J. described traveling with Whitney to visit Adams in St. Paul, Minnesota, so Whitney could obtain methamphetamine. Id. T.J. testified that after Whitney went to prison, M.F. became involved with Adams. CR Doc. 178-1 at 72. She received methamphetamine from Adams at M.F.'s home. Id. at 87. T.J. testified she received approximately a pound of methamphetamine from Adams, Whitney, and M.F., with at least half a pound coming directly from Adams. Id. at 90-91.

---

[3] This Court uses initials of the cooperating witnesses in this opinion and order.

S.S.C. testified she met Adams through her boyfriend, Whitney. CR Doc. 178-1 at 156. She stated Whitney sold methamphetamine for Adams beginning in 2015 and that she sold methamphetamine for Adams beginning in 2016 after Whitney was imprisoned. Id. at 158. S.S.C. testified in detail about the trips she and Whitney would make to St. Paul to obtain methamphetamine from Adams, and the trips Adams would make to the reservation to deliver methamphetamine to her and Whitney. Id. at 162-89. While returning from their final trip together from St. Paul, Minnesota, Whitney and S.S.C. were stopped by the Minnesota State Patrol. CR Doc. 150 ¶ 12. Law enforcement found four individual bags of methamphetamine hidden in a speaker box in the trunk, which the defendant placed in there. Id. Whitney's phone was seized and searched, revealing a series of text messages between Whitney and Adams discussing methamphetamine distribution. Id. Following Whitney's arrest and subsequent death, S.S.C. continued dealing methamphetamine for Adams until she had her baby in 2017. Id. S.S.C. testified she frequently saw Adams with a handgun. Id.

M.F. testified that he began dealing methamphetamine for Adams in October 2017. Id. at ¶ 14. Adams brought M.F. large quantities of methamphetamine roughly three times per month. Id. Each time, Adams would stay with M.F. until all the methamphetamine was sold. Id. M.F. estimated that Adams brought between one-quarter and one-half pound each trip and would stay at M.F.'s home four or five days at a time. Id. He also stated that Adams carried a handgun.

In June 2018, a search warrant for M.F.'s home was executed while Adams and a man who traveled with him from St. Paul were the only individuals in the home. Id. at ¶ 15. M.F. testified that he was on the phone with Adams while law enforcement was outside the residence. Id. During the conversation, Adams stated he flushed methamphetamine down the toilet. Id. Upon execution of the warrant, Adams was taken into custody and placed in a patrol vehicle where audio and video

3

was recorded. Id. From the home, officers recovered scales, hundreds of baggies, a small amount of methamphetamine, a stash can, and Adams's backpack. CR Doc. 178-2 at 69-70. Inside the backpack, officers found a second scale, more baggies, and a baby bottle containing a clear liquid that tested positive for methamphetamine. Id. at 77-84. The government played several video clips from the patrol vehicle wherein Adams admitted that the backpack was his and identified its contents. CR Doc. 150 at ¶ 12.

The evidence at trial established Adams was involved in distributing at least 4.6 kilograms of methamphetamine. Id. at ¶ 19. He received multiple enhancements for possessing a firearm during the offense, committing the offense as part of a criminal livelihood, and being an organizer or leader of the criminal activity. Id. at ¶¶ 24-28. Adams received a 360-month prison sentence. Doc. 164 at 2. He subsequently appealed both his conviction and sentence. United States v. Adams, 840 F. App'x 64 (8th Cir. 2021) (per curiam).

On appeal, Adams argued that the evidence presented at trial was insufficient to sustain his conviction; that this Court erred by admitting the text messages, letters, and recorded jail phone calls between Adams and Whitney; and that this Court erred by imposing a two-level enhancement for an offense engaged in as criminal livelihood. Id. at 65-66. The Eighth Circuit affirmed his conviction and sentence. Id. The Eighth Circuit concluded that the "evidence in this case was overwhelming," noting 16 total witnesses testified against Adams, including several who personally sold drugs for Adams. Id. at 65. The Eighth Circuit ruled that given the overwhelming evidence, "the admission of text messages, letters, and recorded jail phone calls with a co-conspirator did not affect Adams's 'substantial rights or ha[ve] more than a slight influence on the verdict.'" Id. (alteration in original) (quoting United States v. Halk, 634 F.3d 382, 488 (8th Cir. 2011)). Finally, the Eighth Circuit affirmed Adams's sentence, ruling this Court did not err in

4

attributing between 1.5 and 5 kilograms of methamphetamine to Adams, and finding "plenty of

reason to impose a two-level enhancement." Id. at 66.

## II.  Discussion

Adams seeks relief pursuant to 28 U.S.C. § 2255, which states in part:

> A prisoner in custody under sentence of a court established by Act of Congress
> claiming the right to be released upon the ground that the sentence was imposed in
> violation of the Constitution or laws of the United States, or that the court was
> without jurisdiction to impose such sentence, or that the sentence was in excess of
> the maximum authorized by law, or is otherwise subject to collateral attack, may
> move the court which imposed the sentence to vacate, set aside or correct the
> sentence.

28 U.S.C. § 2255(a).  When considering a § 2255 motion, the court holds an evidentiary hearing

"unless 'the motion and the files and the records of the case conclusively show that [the prisoner]

is entitled to no relief.'"  Holder v. United States, 721 F.3d 979, 993 (8th Cir. 2013) (citation

omitted).  "No hearing is required where the claim is inadequate on its face or if the record

affirmatively refutes the factual assertions upon which it is based."  Watson v. United States, 493

F.3d 960, 963 (8th Cir. 2007) (cleaned up and citation omitted).  The Eighth Circuit has stated:

> A § 2255 motion may be dismissed without hearing if (1) movant's allegations,
> accepted as true, would not entitle him to relief, or (2) the allegations cannot be
> accepted as true because they are contradicted by the record, are inherently
> incredible, or are conclusions rather than statements of fact.

Winters v. United States, 716 F.3d 1098, 1103 (8th Cir. 2013) (cleaned up and citation omitted).

Adams presents a host of claims, many with legal and factual overlap.  See CIV Docs. 5,

9.  Courts interpret arguments in a pro se motion broadly.  Sappington v. United States, 523 F.2d

858, 860 (8th Cir. 1975) (per curiam).  Adams's claims can be categorized under four distinct

grounds: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; (3) judicial

misconduct; and (4) insufficiency of evidence.  Upon review of his motion and supporting

memoranda, the filings, and the record, this Court can dismiss this case on the merits without an

evidentiary hearing because the record conclusively demonstrates that Adams is not entitled to relief.

## A. Adams's Ineffective Assistance of Counsel Claims

The Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel in criminal prosecutions. U.S. Const. amend. VI; see also Gideon v. Wainwright, 372 U.S. 335, 339 (1963); Johnson v. Zerbst, 304 U.S. 458, 459 (1938); Powell v. Alabama, 287 U.S. 45, 63 (1932). To establish a claim of ineffective assistance of counsel, the petitioner must show both that his counsel's performance was deficient, and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To meet this two-pronged standard, the petitioner must show that "(1) his counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." United States v. Ledezma–Rodriguez, 423 F.3d 830, 836 (8th Cir. 2005).

The first part of the Strickland test requires a movant show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." Williams v. United States, 452 F.3d 1009, 1013 (8th Cir. 2006). The petitioner must "overcom[e] the strong presumption that defense counsel's representation fell 'within the wide range of reasonable professional assistance.'" Delgado v. United States, 162 F.3d 981, 982 (8th Cir. 1998) (quoting Strickland, 466 U.S. at 689).

"The second part of the Strickland test requires that the movant show that he was prejudiced by counsel's error . . . ." Williams, 452 F.3d at 1013 (citation omitted). This means proving that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (citation omitted). "A reasonable probability is a

6

probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Ford v. United States, 917 F.3d 1015, 1021 (8th Cir. 2019) (citation omitted).

"Because the defendant must satisfy both prongs of the Strickland test to succeed on an ineffective-assistance claim, a court may decide such a claim by addressing either prong." Id. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.

### 1. Failure to Conduct Psychological Evaluation

Adams first alleges both his trial counsel, John Murphy, and appellate counsel, Ashley Brost, rendered ineffective assistance because they knew he had a mental illness and was not competent to stand trial yet failed to raise this claim. CIV Doc. 5 at 5. The record does not support Adams's claim that he was incompetent, and thus Adams has failed to show that "his counsel's representation fell below an objective standard of reasonableness." Ledezma–Rodriguez, 423 F.3d at 836.

Adams does not provide evidence of a diagnosis or any other indication that he would have been incompetent. He does not identify any behavior or other basis that should have prompted counsel to question his competency before trial. Murphy, who represented Adams throughout two trials and sentencing, stated he "did not see sufficient signs or symptoms of mental illness to warrant requesting a psychological evaluation." CIV Doc. 23 at 1. Murphy noted that Adams was of average intelligence and had a firm grasp on reality. Id. 1-2. Both Murphy and Brost noted that Adams was able to and did assist in preparing his defense. Id. at 2 ("[Adams] understood the roles

7

of the various participants, was able to comport himself during the trial, and identified facts and issues he wanted me to pursue."); CIV Doc. 21 at 2 ("Mr. Adams also wrote me detailed letters, which included various case law and lists of issues he wanted me to look into and/or address on appeal – none of which related to his mental competency."). Nothing in the witness testimony even hinted at Adams lacking competence. Finally, the presentence investigation report revealed that Adams had "never participated in a mental health evaluation or been treated for mental illness" and that Adams believed his own mental and emotional states were stable. CR Doc. 150 ¶ 88.

To support his allegation, Adams states that he received Supplemental Security Income (SSI); however, he does not indicate what impairment qualified him for SSI. CIV Doc. 5 at 5. Qualification for SSI alone does not give rise to a finding of incompetency. See United States v. Barraza, 982 F.3d 1106, 1113 (8th Cir. 2020) ("Presence of a mental illness does not equate with incompetency to stand trial."). Rather, "[a] defendant is mentally incompetent to proceed with trial or sentencing if . . . he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." Id. at 1112-13 (citation omitted).

Here, Adams understood the nature and consequences of his proceeding and was able to assist in his defense. There was no reasonable cause to believe Adams was suffering from a mental disease or defect rendering him mentally incompetent. Adams, therefore, failed to show that his counsel's performance was deficient under the Strickland test by failing to conduct a psychological evaluation.

### 2. Failure to Call Witnesses

Adams next asserts that his trial counsel did not render effective assistance by failing to call witnesses. CIV Doc. 5 at 5; CIV Doc 9 at 7. Adams claims Nicole Campbell would have testified the two were together in Minnesota during the first or second day of each month

8

"pulling SSI benefits from the ATM." CIV Doc. 5 at 5. He claims Joy Ford would have testified

that she gave him the baby bottle and witnessed him "pour rubbing alcohol and witch hazel into

the bottle." Id. Finally, he claims Lyle Whitney would have contradicted S.S.C.'s testimony that

Adams gave Leon Whitney methamphetamine. Id.

Murphy was "unable to secure any alibi witnesses to account for Adams' whereabout

during the duration of the conspiracy." CIV Doc. 23 at 3. In his affidavit, Murphy notes that

"Adams was alleged to have conspired to distribute large quantities of methamphetamine . . .

over many months. There was no person or persons who could account for Adams' whereabouts

for the duration of the conspiracy." Id. Murphy contacted Nicole Campbell, and she was not

able to testify that he was with her the first of each month in Minnesota. Id. at 4. But see CIV

Doc. 28 (affidavit of Nicole M. Campbell swearing she was with Adams the first of each month).

Even if she had, her testimony would not have been highly probative, as it would not account for

Adams's whereabouts for the remaining days of the conspiracy. After all, several witnesses

testified to traveling to St. Paul to obtain methamphetamine from Adams or to Adams travelling

periodically from Minnesota to Central South Dakota with methamphetamine. And Adams was

eventually arrested in South Dakota at M.F.'s home. There was ample evidence that Adams was

in both Minnesota and South Dakota during the time of the conspiracy to distribute

methamphetamine.

Joy Ford was Adams's paramour, and the two frequently had disputes. CIV Doc. 23 at 3.

Adams initially told Murphy she would be an alibi witness, but "[Adams] then said he did not

want her called as a witness." Id. She was also unable to account for where Adams was for most

of the pertinent times. Id. Lyle Whitney's potential testimony, if taken as true, would do little to

discredit S.S.C.'s testimony, which was corroborated by text messages and phone calls, as well

9

as by others who testified that Adams involved Leon Whitney in the methamphetamine distribution. It also would not have discredited testimony from other witnesses regarding Adams's drug distribution activities.

Murphy's professional opinion was that the three witnesses Adams identified would be "weak at best, damaging at worst." Id. at 4. Courts are not to "second-guess" trial strategy. Williams, 452 F.3d at 1013. "The Sixth Amendment right to counsel functions to ensure that defendants receive a fair trial, not a perfect one." Willis v. United States, 87 F.3d 1004, 1008 (8th Cir. 1996). Murphy was not deficient in failing to call these witnesses. Adams has not shown deficient investigation, and Murphy's conclusion that the potential witnesses were of little help and possibly harmful was reasonable. Moreover, Adams has failed to show that even if the witnesses testified "there is a reasonable probability that . . . the result of the proceeding would have been different." Williams, 452 F.3d at 1013 (cleaned up) (citation omitted).

### 3. Failure to File Motions for Suppression

Adams claims his counsel's failure to file motions to suppress evidence obtained from M.F.'s home constituted ineffective assistance. CIV Doc. 5 at 6; CIV Doc. 8 ¶ 12; CIV Doc. 9 at 4-5. Adams argues he was a "residential house guest" at the time law enforcement executed the search warrant and that the search of his backpack violated his Fourth Amendment right to be free from unreasonable searches. CIV Doc. 66 at 15-16.

Adams could have standing to raise the Fourth Amendment issue because he may have had a legitimate expectation of privacy within M.F.'s home while staying there as an overnight guest. Adams traveled from Minnesota to central South Dakota, bringing between one-quarter and one-half pound of methamphetamine. CR Doc. 178-1 at 262. Adams would stay at M.F.'s home until all methamphetamine was sold, which was typically four or five days. Id. Even though the primary

10

purpose of his stay was to engage in illegal activity, Adams might have had a reasonable expectation of privacy in M.F.'s home. <u>Minnesota v. Olson</u>, 495 U.S. 91, 96-97 (1990) (holding "status as an overnight guest alone is enough to show that [the guest] had an expectation of privacy in the home that society is prepared to recognize as reasonable"); <u>see United States v. Allen</u>, 720 F. App'x 254, 257 (6th Cir. 2018) ("The use of a space for illegal activity does not alter these privacy expectations, so long as the person is an overnight, not business, guest.").

Adams fails to satisfy the <u>Strickland</u> test because he cannot show prejudice. Adams has not established that the June 2018 search warrant was somehow defective to justify suppression of evidence seized as a result of Adams's arrest. Rather, testimony at trial points to law enforcement having probable cause to seek and obtain a warrant to search M.F.'s residence based on drug activity ongoing there. Moreover, even if the items seized at the M.F. home were suppressed, there is not a reasonable probability that the outcome of his case would have been different. Sixteen witnesses testified against Adams, including several co-conspirators who personally sold methamphetamine for Adams. Each witness was thoroughly cross-examined. As the Eighth Circuit noted, "[s]tanding alone, this evidence was more than sufficient to show that the conspiracy existed and that he was a part of it." <u>Adams</u>, 840 F. App'x at 65.

### 4. Failure to File Motion for New Trial

Adams claims counsel was ineffective because counsel did not file a motion for a new trial. CIV Doc. 8 ¶ 14. This claim plainly fails. Before being sentenced, Adams filed a pro se motion for new trial, which this court considered and rejected. CR Doc. 137 at 9. As explained in that opinion and order, there was no basis for granting a new trial for any of Adams's arguments. <u>Id.</u> at 10-15. Thus, there is no reasonable probability the result would have been different had Murphy filed the motion instead of Adams.

### 5. Failure to Argue Mitigating Factors at Sentencing

Adams also contends that his trial counsel rendered ineffective assistance by failing to argue mitigating factors at sentencing. CIV Doc. 5 at 5. At the time of sentencing, Adam's guideline range was 360 months to life imprisonment, based on an offense level of 40 and a criminal history category of VI. CR Doc. 150 at 25. He received a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(16) for receiving an adjustment under § 3B1.1 and for "commit[ing] the offense as part of a pattern of criminal conduct engaged in as a livelihood." CR Doc. 150 at 7. This Court sentenced him to 360 months of imprisonment, the bottom of the guideline range. CR Doc. 164.

Adams argues his counsel should have presented evidence of a history of SSI payments and lawsuit settlement income to show the criminal conduct was not engaged in for livelihood. He states he "received several law suits [sic] settlements during the [year] of 2015," including "$12,000.00 from the St. Paul Minnesota police department for assault, $10,000.00 from TSR settle [sic] of a slip and fall at a Holiday gas station, and $16,500.00 from SSI." CIV Doc. 9 at 4. As part of the presentence investigation, Adams reported that he received monthly SSI payments of $750 but did not report any other income or cash. CR Doc. 150 at 24. After accounting for monthly expenses, Adams's monthly cash flow was negative. Id. Adams's assertion that he had money from settlements was not reported at the time of sentencing. Id.

Even if Adams's claims regarding the settlements are true, he was not prejudiced by their exclusion at sentencing. First, the settlement payments totaling $22,000 are too small to negate the inference that Adams engaged in the sale of drugs as a livelihood. Second, and more importantly, Adams's sentence would be the same even eliminating the enhancement. Without the two-level enhancement under U.S.S.G. § 2D1.1(b)(16), Adams would have had a total offense

12

level of 38. A person with a total offense level of 38 in Criminal History Category VI has a

guideline range of 360 months to life imprisonment. See U.S.S.G., Ch. 5, Pt. A (Sentencing Table).

### 6. Failure to Raise Racial Bias of Jurors

During voir dire, this Court noted the racial dynamic of this case, including that many

witnesses were going to be Native American and that Adams is Black. CR Doc. 177 at 46. This

Court asked whether any of the prospective jurors could not be fair to a person who is Native

American, African American, or of a race different than their own. Id. One prospective juror

indicated he would have an issue being impartial, and he was dismissed for cause. Id. Adams's

appellate counsel Brost declined to raise the issue of racial bias after reading the transcript of voir

dire. CIV Doc. 21 at 2-3. She reasoned that because the Court dismissed the juror who stated

racial bias may be an issue and because the remaining prospective jurors indicated race would not

impact their ability to make an impartial decision, the claim would not be successful on appeal.

Id.

In his § 2255 petition, Adams alleges his trial and appellate counsel rendered ineffective

assistance by failing "to raise the fact [that] the jury was racially bias[ed] because there was not

one of the peers belonging to me or black." CIV Doc. 9 at 18. Adams further states that "the

United States District of South Dakota central division illegally and unconstitutionally

discriminated against African American[s] in the selection of the ... trial jury." Id. Adams

offered no evidence to support his assertion that discrimination occurred other than the fact that

there were no Black jurors in his venire.

"[T]he American concept of the jury trial contemplates a jury drawn from a fair cross

section of the community." Taylor v. Louisiana, 419 U.S. 522, 527 (1975). That is, a jury must

"be a body truly representative of the community." Smith v. Texas, 311 U.S. 128, 130 (1940). "It

13

is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. However, neither statute nor the Sixth Amendment requires precise proportional representation of minority groups on jury panels.  Swain v. Alabama, 380 U.S. 202, 208–09 (1965), overruled on other grounds by Batson v. Kentucky, 476 U.S. 79, 95–96 (1986).

To show a prima facie case of a violation of the Sixth Amendment right to a fair jury due to underrepresentation of Black Americans, Adams must satisfy the three-part test set forth by the Supreme Court of the United States in Duren v. Missouri:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
> (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. 357, 364 (1979). "There is no dispute that Black people are a 'distinctive' group for purposes of the Duren test." United States v. Reed, 972 F.3d 946, 953-54 (8th Cir. 2020). However, Adams is unable to satisfy the second and third parts of the Duren test and thus fails to demonstrate his counsel was deficient for not raising the issue.

The second element of the Duren test requires that the defendant show "representation of [the] group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community."  In Swain, the Supreme Court of the United States determined that an underrepresentation of as much as ten percent as calculated by the "absolute disparity concept" does not constitute prima facie evidence of underrepresentation.  380 U.S. at 208–09. The Central Division in the District of South Dakota includes eighteen counties, four of which comprise portions of the Lower Brule Indian Reservation, Crow Creek Indian Reservation,

14

Cheyenne River Indian Reservation, and Rosebud Indian Reservation. The 2020 Census Bureau population data indicate approximately 0.7% of people living within the Central Division identify as Black.[4] Adams offers no evidence to show the representation of Black individuals in venires from which juries are selected is unfair and unreasonable in relation to the fact that the Black population constitutes less than a percent of the community in the Central Division. Duren 439 U.S at 364; see also United States v. Clifford, 640 F.2d 150, 154-56. (8th Cir. 1981).

Adams also fails to satisfy the final element for a prima facie case under the Duren test because he has not shown that any underrepresentation is due to systematic exclusion of the distinctive group in the jury selection process. The Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-69, requires jurors to be randomly selected from voter registration lists or the lists of actual voters of the political subdivisions within the district and is intended to eliminate discriminatory and arbitrary selection practices to ensure a representative cross section of the community. 28 U.S.C. § 1863(b)(2). The District of South Dakota has ensured a random selection of jurors through its formal Jury Plan. The Eighth Circuit approved the District of South Dakota's Jury Plan in Clifford. 640 F.2d at 156. Since Clifford, the Eighth Circuit has consistently upheld the use of voter registration lists as the sole source to select jury pools throughout the circuit. See, e.g., United States v. Rodriguez, 581 F.3d 775, 790 (8th Cir. 2009). Furthermore, Adams offers

---

[4] The approximation of 0.7% was calculated using the data for each of the 18 counties in the Central Division, yielding an estimated 490 Black individuals and a total population of 69,820. Buffalo County 1.1% of 1,948; Dewey County 0.7% of 5,239; Faulk County 0.5% of 2,125; Gregory County 0.4% of 3,994; Haakon County, 0.3% of 1,872; Hand County, 0.5% of 3,145; Hughes County, 0.9% of 17,765; Hyde County, 0.7% of 1,262; Jerauld County, 0.5% of 1,663; Jones County, 0.4% of 917; Lyman County, 0.6% of 3,718; Mellette County, 0.6% of 1,918; Potter County, 0.7% of 2,472; Stanley County, 0.9% of 2,980; Sully County, 2.5% of 1,446; Todd County, 0.5% of 9,319; Tripp County, 0.5% of 5,624; Ziebach County, 0.6% of 2,413. U.S. Census Bureau, QuickFacts, https://www.census.gov/quickfacts/fact/table/US/POP010220.

no proof that minorities in South Dakota face obstacles to register to vote. See id. (requiring proof that the group alleged to be excluded faced obstacles to voting).

Because Adams offered no evidence to support his assertion that his Sixth Amendment right to a jury was violated, he is unable to satisfy the second and third elements of the Duren test. Consequently, Adams's trial and appellate counsel did not perform "below an objective standard of reasonableness" by declining to raise any argument regarding the makeup of the jury, and Adams was not prejudiced as a result. Strickland, 466 U.S. at 688.

### 7. Remaining Ineffective Assistance Claims

Adams's remaining ineffective assistance claims fail because they contradict the record. See Winters, 716 F.3d at 1103 ("A § 2255 motion may be dismissed without hearing if . . . the allegations cannot be accepted as true because they are contradicted by the record . . . ."). Adams alleges his counsel was ineffective for failing to call a witness to rebut M.F.'s "false testimony that [Adams] pistol whooped [his] childhood friend, [Rico]." CIV Doc. 9 at 8. However, Murphy, Adams's trial counsel, objected to the government's line of questioning regarding Rico. CR Doc. 178-1 at 278-79. After a sidebar, this Court sustained the objection, noting testimony regarding Adams's alleged use of a gun to assault Rico would be unfairly prejudicial and offered limited probative value for the drug conspiracy charge. Id. at 280. Because of Murphy's objection, testimony concerning Rico and an alleged pistol-whipping incident was not presented to the jury.

Adams also asserts his counsel was ineffective for failing to introduce evidence that law enforcement did not fingerprint the items taken from M.F.'s home. CIV Doc. 9 at 7. Murphy actually did point out that no fingerprinting was done. Murphy cross-examined Lieutenant Andrew Lepkowski, who admitted he did not seek fingerprint analysis nor DNA testing on any of the items seized. CR Doc. 178-3 at 89-90. Regardless, proof of conspiracy to distribute

methamphetamine does not require evidence that the defendant actually handled the drugs or paraphernalia. See United States v. Jiminez, 487 F.3d 1140, 1148 (8th Cir. 2007) ("In order to be a conspirator in a drug distribution operation, it is not necessary to physically handle drugs. The absence of [Defendant's] fingerprints on the methamphetamine would not undermine the jury's conclusion that he was [involved] in the conspiracy.").

Lastly, Adams insists that trial his counsel was ineffective for failing to introduce evidence of a negative urine analysis test, which Adams argues proves "it was impossible for the defendant to have handled any methamphetamine at [M.F.'s] home." CIV Doc. 5 at 6; see also CIV Doc. 9 at 6-7. However, Murphy questioned Lt. Lepkowski on this topic, who admitted Adams did not test positive for methamphetamine. CR Doc. 178-3 at 90-91. Again, even if Murphy had not elicited this testimony, failure to introduce test results is not ineffective assistance when neither use nor handling of methamphetamine was an element of the crime he was convicted. Jiminez, 487 F.3d at 1148.

## B. The Remaining Grounds in Adams's § 2255 Petition

Adams's § 2255 petition asserts prosecutorial misconduct, judicial misconduct, and insufficiency of the evidence claims. See CIV Doc 5 at 5-6. The Government argues that these claims (portions of Grounds II, III, and IV in Adams's petition) must be dismissed because Adams either raised or failed to raise them on direct appeal. Two rules underlie this argument. First, prisoners typically cannot use § 2255 to relitigate claims that were raised and decided on direct appeal. See Sun Bear v. United States, 644 F.3d 700, 702 (8th Cir. 2011) (en banc). The "rare exceptions," id., to this rule include certain sorts of changes in the law, Davis v. United States, 417 U.S. 333, 346–47 (1974); English v. United States, 998 F.2d 609, 612–13 (8th Cir. 1993), or when the prisoner produces "convincing new evidence of actual innocence," United States v. Wiley, 245

F.3d 750, 752 (8th Cir. 2001). Second, certain claims not raised on direct appeal are procedurally defaulted and may not be asserted in a habeas petition unless the petitioner can demonstrate "cause and actual prejudice" or "that he is actually innocent." Bousley v. United States, 523 U.S. 614, 622 (1998) (internal quotation marks and citations omitted); United States v. Collier, 585 F.3d 1093, 1096–97 (8th Cir. 2009). Adams either raised or failed to raise the remaining claims in his § 2255 petition, and because no exceptions apply to any claims, his petition must be dismissed.

### 1. Prosecutorial Misconduct Claims

Adams's alleges prosecutorial misconduct occurred through the Government's use of text messages with Leon Whitney at trial and through the withholding of exculpatory evidence. CIV Doc. 5 at 5-6. These claims must be dismissed because Adams either raised or failed to raise them on direct appeal.

Adam's alleges "[p]rosecution use[d] Leon W. at my trial to point a false light to the jury that the decease[d] who never proffered, never gave a statement was a government witness." Id. at 5. To the extent that Adams contests the admissibility of the text messages between Adams and Whitney, this claim is barred because Adams raised this issue in his direct appeal. Adams, 840 F. App'x at 65; Brief of Appellant at 40-45, No. 19-3543, 2020 WL 2598139 (May 13, 2020). Adams may not relitigate the admissibility of the messages in his § 2255 petition. Adams's claim that the use of the text messages constitutes "prosecutorial misconduct fraud upon the court", CIV Doc. 5 at 5, is procedurally defaulted because he did not raise the claim on direct appeal.

Adams also alleges prosecutorial misconduct through the withholding of exculpatory evidence. Murphy, Adams's trial counsel, did not believe any Brady violations occurred but noted one "late disclosure of evidence" that "pertained to one of the government's witnesses who reached an agreement . . . during the trial." Civ Doc. 23 at 6-7. Murphy stated, the "government notified

18

[him] that they were in negotiations as they were happening, and provided [him] with documents as they were produced." Murphy did not "believe the prosecution did anything that rose to the level required by law for a case to be dismissed for prosecutorial misconduct." Because Adams did not raise this claim on direct appeal, it is procedurally defaulted. Adams, 840 F. App'x; Brief of Appellant, No. 19-3543, 2020 WL 2598139 (May 13, 2020).

### 2. Judicial Misconduct Claims

Adams alleges judicial misconduct throughout his § 2255 petition. Many of his allegations conflate the roles of the judge and the jury. Adams states, "the thought never cross[ed] [this Court's] mind that these people are drug addicts[,] and they will say and do anything to gain freedom again to use methamphetamine and even lie." CIV Doc. 5 at 6. Adams appears to be attacking the credibility of the witnesses who testified against him. However, the jury, not the judge, is to assess the credibility of the witnesses.

Adams next alleges judicial misconduct through baseless assertions of corruption. Without offering any details as to why he has such mistaken notions, Adams asserts this Court "conspired with all three lawyers behind [his] back talking to all lawyers . . . off the record discussing the case to convict [him]." CIV Doc. 5 at 6. He further alleges this Court had "financial interest in the outcome of the proceeding" and wanted to ensure the "state of South Dakota didn't loose [sic] its federal funding." CIV Doc. 9 at 19. He also alleges, again baselessly, this Court "conspired with . . . high ranking public officials to predetermine the outcome of [the case]." Id. A § 2255 claim may be dismissed if the allegations are inherently incredible or are conclusions rather than statements of fact. Winters, 716 F.3d at 1103. Because Adams's claims of judicial misconduct are conclusory and inherently incredible, they must be dismissed without a hearing.

### 3. Insufficiency of the Evidence Claims

Adams asserts insufficient evidence exists to sustain his conviction. He alleges the Government failed to prove interstate commerce. CIV Doc. 9 at 10. He also cites what he contends is false or misleading testimony from A.R., T.J., and S.S.C. CIV Doc. 9 at 13. In his Response to the Government's Motion to Dismiss, Adams lists fourteen details that the prosecution failed to prove, such as "no evidence existed to show that Mr. Adams somehow benifited [sic] from drug proceeds in the form of properties, businesses, or lavish living styles normally associated with major narcotic traffickers." CIV Doc. 66 at 33-35. He requests this Court apply the cumulative effect doctrine to vacate his sentence. CIV Doc. 51.

On direct appeal, Adams challenged the sufficiency of the evidence to support his conviction. Adams, 840 F. App'x at 65; Brief of Appellant at 30-40, No. 19-3543, 2020 WL 2598139 (May 13, 2020). He attacked the credibility of the witnesses, highlighted the absence of direct evidence, and contested the laboratory results taken from the baby bottle, which Adams stated contained a mixture of witch hazel and rubbing alcohol for his skin. Brief of Appellant at 30-40, No. 19-3543, 2020 WL 2598139 (May 13, 2020). Because this claim was raised on direct appeal, Adams is precluded from raising it in his § 2255 petition. Sun Bear, 644 F.3d at 70.

Here, the exceptions do not apply. While Adams filed affidavits of Nicole Campbell stating she was with Adams at the beginning of each month to withdraw his social security checks, CIV Docs. 25, 27, 28, this is not "convincing new evidence of actual innocence," Wiley, 245 F.3d at 752, because the conspiracy transpired for multiple years and her statements do not account for Adams's whereabouts or his communications throughout the entirety of the conspiracy. Her affidavit, for reasons explained previously, leaves unrefuted the substantial evidence that Adams was back and forth between Minnesota and South Dakota during the time of the conspiracy. Nor

does it alter the Eighth Circuit's conclusion that "the evidence in this case weas overwhelming" as to Adams's guilt. <u>Adams,</u> 840 F. App'x at 65.

### C. Certificate of Appealability

A prisoner is entitled to an evidentiary hearing on a § 2255 motion unless the motion, files, and records of the case conclusively show that the prisoner is not entitled to relief. 28 U.S.C. § 2255; <u>Engelen v. United States,</u> 68 F.3d 238, 240 (8th Cir. 1995). A § 2255 motion can thus be dismissed without a hearing if (1) the prisoner's allegations, accepted as true, would not entitle the prisoner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact. <u>Engelen,</u> 68 F.3d at 240. For the reasons explained above, the motion, files, and records in this case conclusively show that Adams is not entitled to relief on either his independent claims or his ineffective-assistance-of-counsel claims.

When, as here, a district court denies a § 2255 motion, the movant may not appeal without a certificate of appealability. District courts cannot issue a certificate of appealability unless the movant makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" means a showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel,</u> 529 U.S. 473, 484 (2000); <u>see also id.</u> (explaining that the question when a district court denies a habeas petition on procedural grounds is whether "jurists of reason would find" the district court's procedural ruling debatable). This Court declines to issue a certificate of appealability because Adams has neither made a substantial showing of the denial of a constitutional right nor shown that the procedural bars present here are debatable.

### D. Adams's Motions for Discovery

This Court previously granted Adams's motion for discovery to the extent that he receive a copy of all transcripts prepared and exhibits received in evidence in his criminal case. CIV Doc. 50. Adams subsequently filed a Motion to Compel Discovery, CIV Doc. 65, and a Motion to hold the Respondents in contempt of court, CIV Doc. 64. Adams seeks to compel all discovery materials, including investigatory materials that were outside the scope of this Court's previous order.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997). Rule 6(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts provides that a district court "may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." After reviewing the record and Adams's petition, this Court does not find good cause to authorize discovery beyond what this Court authorized in its previous order.

## III.   Conclusion

For the reasons stated above, it is

ORDERED that Adams's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, Doc. 1, is denied. It is further

ORDERED that the Government's Motion to Dismiss, Doc. 41, is granted. It is further

ORDERED that Adams's Motion requesting application of the cumulative effect doctrine, Doc. 51, Motion for Contempt, Doc. 64, Motion to Compel Discovery, Doc. 65, Motion for Release on Bail, Doc. 67, and Motion to Appoint Counsel, Doc. 68, are denied. It is finally

ORDERED that no certificate of appealability will issue.

DATED this __16th__ day of October, 2024.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE